No. 71.—JOHN WOOLFOLK, plaintiff in error, *vs.* JAMES BEAT-LY, administrator, &c. defendant in error.

[1.] Long acquiescence or *làches*, by parties out of possession; is productive of much hardship and injustice to others, and cannot be excused but by showing some actual hindrance or impediment, caused by the fraud or concealment of the party in possession.

[2.] The party guilty of gross *laches*, cannot screen his title to the just imputation of staleness, merely under the pretence of an imaginary impediment or technical disability.

[3.] A former administration will be presumed to protect the ancient title, and possession of personal property, as well as real estate.

Decision by Judge WORRELL, at Chambers, 20th June, 1855.

Andrew McNeely, by his last will and testament, gave and bequeathed to his wife, Esther, as follows: "four hundred and eighty dollars; and I also require my son-in-law, John Whigham, to build her a good, comfortable house on the plantation where I now reside, to be used and occupied by her during her life, or as long as she may choose; and my said son-in-law is also to furnish her, yearly, and every year during her life, with forty bushels of corn, and 100 weight of clean cotton. I do further give unto my wife,

two beds and furniture, one large painted pine-chest and cupboard, and one table and three chairs. *I do also give further to my wife, during her residence on said plantation, a small negro girl, Chloe,* and forty weight of soap, and five bushels of salt, to be furnished her, out of my estate, every year, and four hundred weight of pork, and one barrel of flour yearly, and every year." By another item, he gave his wife a side-saddle and fire-wood, so long as she remained on the plantation. By still another item, he gave her the tea kettle and other tea furniture, and shoes, during her life. There was no residuary clause in the will. His son-in-law, John Whigham, and three of his friends, were appointed the executors of this will.

He died in 1810.

In 1855, John Woolfolk filed a bill setting forth this will, and charging that six or seven months after the death of Andrew McNeely, Esther, his widow, removed from the plantation, with the consent of his executors, carrying with her the slave, Chloe; that John Whigham and Jonathan Archer, who, in right of their wives, were the only distributees and heirs at law of said Andrew, had full knowledge of this removal—the said Esther living still in their neighborhood; that in 1835, one William Gordon, the son of the said Esther, by her consent and direction, sold the said negro, Chloe, and her six children, to one James Walker, for a valuable consideration; and that Walker, in 1836, sold the negroes to complainant for $5.000; and that, from 1836 to 1855, complainant had remained in the peaceable and quiet possession of them, exercising ownership over them as his own; that Andrew McNeely owed no debts that remained unpaid; that in 1853, one James Beatly took out letters of administration on the estate of Andrew McNeely, and has commenced an action of trover against complainant for these negroes; that if a recovery be had, John Whigham and Jonathan Archer, or their descendants, will receive the proceeds thereof; and

Woolfolk *vs.* Beatly, adm'r, &c.

that no disability has existed why they should not have taken out administration previous to this time.

The prayer was for a perpetual injunction.

Judge WORRELL refused to sanction this bill, and this decision is assigned as error.

Judge BENNING, having been of Counsel, did not preside.

S. JONES; H. HOLT, for plaintiff in error.

JOHNSON & PATTERSON, for defendant in error.

*By the Court.*—LUMPKIN, J. delivering the opinion.

[1.] Is the complainant entitled to the injunction prayed for, and which was refused by the Circuit Judge?

The case makes it necessary to construe the will of Andrew McNeely, deceased. For if his widow, Esther McNeely, took a life estate in Chloe, then the right of the plaintiffs in trover, to sue, did not accrue till her death; and the bill does not show when that was. It is stated in argument to have been in 1843. If this be true, it would change, materially, the aspect of the case made by the bill.

It is insisted by the learned Counsel for the defendant in error, that Mrs. McNeely took an estate for life, both in the homestead and the negro girl. After a careful examination of the will, we are entirely satisfied that she took a life estate in neither. Some things are given to her by the will absolutely; as to others, a certain annual allowance was to be made her during her life. But as to the house which was directed to be built for her, and the occupancy of which was all the interest bequeathed to her in the land, we hold that, as to this and the girl Chloe, it is clear that the interest was contingent. It might endure for life; that is, provided she continued to live on the place where her husband died; otherwise, she might terminate it whenever she saw fit. It was in the nature of a lease or conditional estate at Common Law,

viz: the home in the house and the use of the negro, were hers so long as she might continue "tenant of the manor of Dale."

Assuming this, then, to be the true construction of the will, as we doubt not it is, what is the equity presented by the bill?

Mrs. McNeely removed from the residence designated in the will, in 1811, the year after her husband died, and settled in Burke County, some six or seven miles distant. The executors resided in the immediate neighborhood, and were knowing to the fact. One of them, Whigham, was her step-son-in-law. Archer, another son-in-law of the old man, also resided in the vicinity. Whigham and Archer were both of age at the time, and were the only heirs and distributees of Andrew McNeely, the testator, having inter-married with his two daughters. The title to Chloe, under the will, was forfeited by Mrs. McNeely's removal. And holding no longer under the will, she held adversely to the heirs at law, the will not having disposed of the remainder in Chloe. This possession continued until 1835, when Wm. Gordon, a son of Mrs. McNeely, by a former husband, sold Chloe and her children to James Walker, by and with the advice and consent of his mother. Thus asserting, as Mrs. McNeely had been doing all the time, ownership and title to Chloe and her increase. Walker sold to John Woolfolk, the complainant in the bill, in 1836, who paid $5.000 for the property, and has held the slaves, peaceably, ever since.

In 1852, forty-two years after the adverse possession in these negroes began, James Beatly, administers upon the estate of Andrew McNeely, with no debts to pay, and commences his suit at Law to recover the property, for the purpose of distribution. And this injunction is prayed for, to restrain the action. We are fully satisfied, that under the facts and circumstances of this case, as disclosed in the bill, and which we assume to be true, for the purposes of this decision, that the *ad interim* injunction should have been granted by the Judge, and that the same should be made perpetual

by a decree, upon the hearing, should the case be sustained by the proof.

[2.] Rank injustice has been frequently practiced, within our knowledge and remembrance, under young administrations taken out to recover stale demands. It is only recently that the Courts of Equity have been resorted to to put a stop to these speculative and unjust proceedings, carried on under color of law. Bonds, judgments and statutory liabilities, the highest obligations known to the law, are all presumed to be paid, after twenty years. The same presumption is made of grants, to protect titles to land. Why should not the same presumption be made of administration? This Court has applied the doctrine to real estate, with the approbation of the profession. No good reason can be assigned why it should not be applied to personalty.

[3.] Cases may occur where an injunction will be granted, even where the demand is not stale, as in the case of *Fox vs. Horah;* (1 *Iredell's Eq. R.* 358;) because it would be against conscience to allow the legal right to be enforced. Would it not be oppressive, in the extreme, to permit this recovery to be had, when there are no creditors, and the heirs have slumbered over their rights for forty years? After such a lapse of time, I would not hesitate to presume an administration, even to defeat a creditor. The peace of society demands that Courts of Equity should interpose, where there has been such gross *laches*, in prosecuting rights, or long acquiescence in the assertion of adverse rights.

In *Wagner et al. vs. Baird et al.* (7 *Howard's S. C. Rep.* 234,) the Court thus appropriately and forcibly expresses itself: " Length of time necessarily obscures all human evidence, and deprives parties of the means of ascertaining the nature of original transactions; it operates by way of presumption, in favor of the party in possession. Long acquiescence and *laches*, by parties out of possession, are productive of much hardship and injustice to others, and cannot be excused but by showing some actual hindrance or impediment, caused by the fraud or concealment of the party in possession,

which will appeal to the conscience of the Chancellor. *The party guilty of such laches, cannot screen his title from the just imputation of staleness, merely by the allegation of an imaginary impediment or technical disability."*

What is the pretence upon which this great hardship and gross injustice, in recovering this property from these *bona fide* purchasers, is sought to be justified? That no administration had been taken out upon the estate of old Andrew McNeely. Why did not the heirs at law force one forty years previously? Why this Rip-Van-Winkle sleep over their rights? Is not this, in the language of the authority, "an imaginary impediment"—a mere "technical disability?" No bad faith, concealment or fraud, is imputed to Mrs. McNeely or those claiming under her. There was no greater obstacle to the procurement of an administration and the prosecution of their claim, at any time within the previous forty years, than there was now. If a disability existed, it was voluntary and self-imposed. Mr. Whigham, one of the only two heirs at law, was an executor—why did he not administer, in order to recover this property, which was outside the will, in 1811? For then the adverse holding commenced. And it was open, visible, notorious and immediately under his eye. There is nothing to mitigate this inexcusable delay. It is troublesome enough to get at the truth of matters transpiring daily around us. We protest against this uncovering the graves of the dead, and groping after the truth of facts involved in the mist and obscurity consequent upon the lapse of nearly half a century. Under such circumstances, we should regard more the antiquity of possession by the defendant, than the novel accruer of title to the plaintiff.